UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| YUKONDRA SCHEARF, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 1:07CV168 LMB |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM**

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Yukondra Schearf for a Period of Disability and Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 et seq. This case has been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the parties. See 28 U.S.C. § 636(c). Plaintiff has filed a Brief in Support of Plaintiff's Complaint. (Document Number 13). Defendant has filed a Brief in Support of the Answer. (Doc. No. 17).

**Procedural History**

On August 1, 2006, plaintiff filed her application for benefits, claiming that she became unable to work due to her disabling condition on July 24, 2006. (Tr. 65-67). This claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated August 8, 2007. (Tr. 30-34, 13-24). Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the

Social Security Administration (SSA), which was denied on September 25, 2007. (Tr. 6, 3-5). Thus, the decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481.

**Evidence Before the ALJ**

A. **ALJ Hearing**

Plaintiff's administrative hearing was held on June 21, 2007. (Tr. 261). Plaintiff was present and was represented by counsel. (Id.). The ALJ began the hearing by admitting the exhibits into the record. (Id.).

The ALJ then examined plaintiff, who testified that she had moved three weeks prior to the hearing and had not informed her attorney or the SSA of her new address. (Tr. 262). The ALJ instructed plaintiff to keep her attorney and the SSA apprised of any address changes. (Id.).

Plaintiff stated that she had a high school education and received Certified Nursing Assistant ("CNA") and Certified Medical Technician ("CMT") training. (Id.). Plaintiff testified that she worked as a medical technician, which involved distributing medication. (Id.). Plaintiff stated that she also worked as a nurse's aide in a nursing home until July of 2006. (Id.). Plaintiff testified that she has not worked since that time. (Id.). Plaintiff stated that she was pregnant during the time period from the date she stopped working to the hearing. (Id.). Plaintiff's attorney indicated that plaintiff realized that she could not receive disability for the pregnancy. (Tr. 263).

Plaintiff testified that she had not received any other technical or vocational training. (Id.). Plaintiff stated that she had not taken any college courses. (Id.). Plaintiff testified that she did not have to take any classes to maintain her CNA or CMT certification. (Id.). Plaintiff stated that

her CNA certification would expire the month after the hearing because she was not working. (Id.).

Plaintiff testified that she had never been in the military. (Id.). Plaintiff stated that she had never been self-employed. (Tr. 264). Plaintiff testified that she had never done any baby-sitting or elder care in her home. (Id.). Plaintiff stated that she had not filed for unemployment benefits or workers' compensation benefits. (Id.). Plaintiff testified that she had never attended vocational rehabilitation. (Id.). Plaintiff stated that she had never been in prison or jail, been convicted of any DUIs or DWIs, participated in rehabilitation for drugs or alcohol, or been hospitalized for drugs or alcohol. (Id.).

Plaintiff testified that she was diagnosed with narcolepsy[1] in 2005. (Tr. 265). Plaintiff stated that she was able to work "very roughly" with this disease. (Id.). Plaintiff explained that she had a hard time staying awake while at work, although she was able to work. (Id.). Plaintiff's attorney indicated that narcolepsy was plaintiff's only physical impairment. (Id.).

Plaintiff testified that she stopped taking her medications while she was pregnant. (Id.). Plaintiff stated that she gave birth on April 27, 2006, to a full-term, healthy child. (Id.). Plaintiff testified that she was caring for this child at the time of the hearing. (Tr. 266). Plaintiff stated that she had two other children, who are aged twelve and eight. (Id.). Plaintiff testified that she was married and that her husband works. (Id.). Plaintiff stated that she stayed home and took care of her children while her husband was at work. (Id.).

---

[1]A sleep disorder that usually appears in young adulthood, consisting of recurring episodes of sleep during the day and often disrupted nocturnal sleep; frequently accompanied by cataplexy, sleep paralysis, and hypnagogic hallucinations; a genetically determined disease. See Stedman's Medical Dictionary, 1281 (28th Ed. 2006).

Plaintiff testified that she was not taking her medications at the time of the hearing. (Id.). Plaintiff stated that the last medication she took was not effective, so Dr. Randall Stahly told her that there was no point in continuing to take it. (Id.). Plaintiff testified that Dr. Stahly suggested another medication but she cannot afford it. (Id.). Plaintiff stated that this other medication costs $360.00 for a two-week supply. (Id.). Plaintiff testified that she tried this medication before her pregnancy and it did not help. (Id.).

Plaintiff testified that she has a history of depression. (Tr. 267). Plaintiff stated that she was last treated for depression after she had her baby. (Id.). Plaintiff testified that she suffered from post-partum depression. (Id.). Plaintiff stated that she also suffered from depression due to her physical impairment. (Id.). Plaintiff testified that she has not received any counseling or therapy for depression. (Id.). Plaintiff stated that she stopped taking medication for depression a few months prior to the hearing. (Id.). Plaintiff testified that she did not take medication for depression while she was pregnant. (Id.). Plaintiff stated that she has never been hospitalized for depression. (Id.).

Plaintiff's attorney then examined plaintiff, who testified that she wakes up at 9:00 a.m. and gets dressed. (Tr. 268). Plaintiff stated that she goes to bed at about 10:00 p.m. (Id.). Plaintiff testified that she naps several times during the day. (Id.). Plaintiff stated that her baby sleeps through the night. (Id.). Plaintiff testified that she spends about an hour a day doing housework. (Id.). Plaintiff stated that she folds laundry, washes dishes, and sweeps the floor, as long as she is able to stay awake. (Id.). Plaintiff testified that she does not iron because she is afraid she will fall asleep and start a fire. (Tr. 269). Plaintiff stated that she is not able to cook during the day because she is afraid she will leave something on the stove and start a fire. (Id.).

The ALJ asked plaintiff who takes care of her child when she has narcoleptic episodes. (Id.). Plaintiff testified that her husband calls her during breaks at work. (Id.). Plaintiff stated that her mother-in-law lives down the road and comes over several times during the day to check on her. (Id.). Plaintiff stated that her grandmother and aunt also call her several times during the day to check on her. (Id.). Plaintiff testified that she has a gated play area in her living room so the child cannot get out when plaintiff falls asleep. (Id.). Plaintiff stated that she has narcoleptic episodes several times a day, up to ten times a day. (Tr. 270). Plaintiff testified that the episodes last a few minutes to an hour. (Id.).

Plaintiff stated that she is not able to operate a motor vehicle because she falls asleep continuously. (Id.). Plaintiff testified that she has been involved in several automobile accidents while driving due to the narcolepsy. (Id.). Plaintiff stated that she has not been involved in any automobile accidents since being diagnosed with narcolepsy, although she has run off the road. (Tr. 271). Plaintiff testified that she drove after being diagnosed with narcolepsy but she was no longer driving at the time of the hearing. (Id.).

The ALJ then stated as follows:

> I'm left with the distinct impression, Ms. Schearf, that either these narcoleptic episodes are not as serious as you are alleging they are, because you leave a one-year old child on its own and you're driving, despite your diagnosis of narcolepsy, or you're very irresponsible.

(Id.).

Plaintiff testified that she was no longer driving at the time of the hearing. (Id.). Plaintiff stated that her mother-in-law comes over to check on her and other relatives call frequently during the day to make sure the baby is safe. (Id.). Plaintiff testified that when her older children come home from school, they make sure she stays awake. (Tr. 272).

Plaintiff stated that her husband works full-time for Craftsman Union at Procter & Gamble. (Id.). Plaintiff testified that her husband has medical insurance through his employer but it does not cover her medication. (Id.). Plaintiff stated that her children receive Medicaid benefits but she is not eligible. (Id.).

Plaintiff's attorney then resumed questioning plaintiff, who testified that she does not belong to any clubs or organizations. (Tr. 273). Plaintiff stated that she no longer attends church because she frequently fell asleep during the service and was embarrassed. (Id.).

Plaintiff testified that her primary physician is Dr. Syed Hashmi, who works at Express Care in Sikeston. (Id.). Plaintiff stated that Dr. Hashmi referred her to Dr. Stahly for treatment of her narcolepsy. (Id.). Plaintiff testified that she has participated in sleep studies. (Tr. 274).

The ALJ then questioned plaintiff, who testified that she is able to stand as long as she does not fall asleep. (Id.). Plaintiff stated that she is able to walk fine, although she occasionally falls asleep while walking. (Tr. 275). Plaintiff testified that she is able to walk two or three miles if she does not fall asleep. (Id.). Plaintiff stated that she is not able to sit long before she falls asleep. (Id.). Plaintiff testified that she is only able to sit for about thirty minutes before she falls asleep. (Id.).

**B.     Relevant Medical Records**

The record reveals that plaintiff presented to Syed K. Hashmi, M.D., on November 16, 2004, with complaints of excessive tiredness for one year that was getting worse. (Tr. 208). Plaintiff also reported headaches that occurred one to two times a week that were helped with ibuprofen. (Id.). Dr. Hashmi diagnosed plaintiff with fatigue with excessive sleepiness,

depression, sleep apnea,[2] and possibly migraines. (Tr. 220). He started plaintiff on Zoloft.[3] (Id.).

Plaintiff presented to Dr. Hashmi on November 29, 2004, with complaints of continued fatigue, sleepiness, and headaches. (Tr. 210). Plaintiff also reported that she "gets upset" at least once a day. (Id.). Dr. Hashmi diagnosed plaintiff with fatigue and continued her on the Zoloft. (Tr. 211).

Plaintiff presented to Dr. Hashmi on January 4, 2005, at which time she reported a significant improvement in her fatigue. (Tr. 212). Dr. Hashmi's assessment was fatigue and depression. (Tr. 213). He prescribed Effexor.[4] (Id.).

Plaintiff returned to Dr. Hashmi on January 21, 2005, at which time she reported that she had been more tired in the past two weeks, more so in the evening while driving home. (Tr. 214). Plaintiff indicated that her fatigue had improved since her first visit. (Id.). Dr. Hashmi diagnosed plaintiff with fatigue and depression and decided to wean plaintiff off of the Effexor and start her on Lexapro.[5] (Tr. 215).

Plaintiff presented to Dr. Hashmi on February 11, 2005, at which time she complained of continued hypersomnia and fatigue. (Tr. 216). Plaintiff reported that she had been involved in a car accident. (Id.). Dr. Hashmi prescribed Zoloft, ordered a sleep study, and referred plaintiff to

---

[2]A disorder characterized by recurrent interruptions of breathing during sleep due to temporary obstruction of the airway. See Stedman's at 119.

[3]Zoloft is indicated for the treatment of depression and anxiety. See Physician's Desk Reference (PDR), 2681-83 (59th Ed. 2005).

[4]Effexor is indicated for the treatment of major depressive disorder. See PDR at 3321.

[5]Lexapro is indicated for the treatment of major depressive disorder. See PDR at 1282.

neurologist Randall L. Stahly. (Tr. 217).

Plaintiff underwent a sleep study on February 13, 2005, which revealed no significant obstructive sleep apnea and possible upper airway resistance syndrome. (Tr. 225). It was recommended that plaintiff undergo testing to rule out narcolepsy. (Id.).

Plaintiff presented to Dr. Hashmi on March 4, 2005, with complaints of fatigue and daytime sleepiness. (Tr. 218). Plaintiff reported no improvement with Zoloft. (Id.). Dr. Hashmi discontinued the Zoloft. (Tr. 219).

Plaintiff underwent sleep testing on March 21, 2005, which was consistent with a diagnosis of narcolepsy. (Tr. 221).

Plaintiff presented to Dr. Stahly on April 13, 2005, for an evaluation upon the referral of Dr. Hashmi. (Tr. 222-23). Plaintiff reported that she became aware of excessive daytime sleepiness at age seventeen with her first motor vehicle accident. (Tr. 222). Plaintiff reported progressive, excessive daytime sleepiness with sleep attacks in addition to occasional bouts of sleep paralysis,[6] hypnagogic hallucinations,[7] and cataplexy.[8] (Id.). Plaintiff indicated that she was working and that she experienced sleep attacks while working, usually after she has eaten lunch. (Id.). Plaintiff stated that she also has difficulty driving home from work due to sleep attacks. (Id.). Dr. Stahly noted that findings from sleep testing were compatible with a diagnosis of

---

[6]Brief episodic loss of voluntary movement that occurs when falling asleep (Hypnagogic sleep paralysis) or when awakening (hypnopompic sleep paralysis). Stedman's at 1420.

[7]Hallucination occurring when going to sleep in the period between wakefulness and sleep; one of the components of narcolepsy. Stedman's at 848.

[8]A transient attack of extreme generalized weakness, often precipitated by an emotional response, such as surprise, fear, or anger; one component of narcolepsy. Stedman's at 324.

narcolepsy. (Tr. 223). Plaintiff's sensory, cerebellar functions, and gait were unremarkable, and her neurovascular exam was negative. (Id.). Dr. Stahly scheduled plaintiff for an MRI and prescribed Provigil[9] and Imipramine.[10] (Id.).

In a letter dated May 4, 2005, Dr. Stahly noted that plaintiff had not responded to a low dosage of Provigil, so he was increasing her dosage. (Tr. 224). Dr. Stahly stated that plaintiff had noted a "marked improvement" in her cataplectic symptoms. (Id.). Dr. Stahly indicated that the MRI of plaintiff's brain was normal. (Id.).

Plaintiff presented to Dr. Stahly on August 2, 2005, at which time he noted that plaintiff had done much better with the addition of Adderal,[11] although she continued to experience some problems with sleepiness at the wheel. (Tr. 193). Dr. Stahly stated that the Provigil was helping and the Imipramine was controlling her tendencies for cataplexy. (Id.). Plaintiff's examination was unremarkable and she was intact neurologically. (Id.). Dr. Stahly indicated that he would continue the present regimen and re-assess plaintiff every six months. (Id.).

Medical records from St. Francis Medical Center reveal that plaintiff gave birth to a baby girl with no complications on April 27, 2006. (Tr. 153-55).

Plaintiff presented to Dr. Stahly on August 1, 2006, to resume her medications following

---

[9]Provigil is indicated to improve wakefulness in patients with excessive sleepiness associated with narcolepsy, obstructive sleep apnea, and other sleep disorders. See PDR at 1132.

[10]Imipramine is indicated for the treatment of depression. See PDR at 1925.

[11]Adderal is indicated for the treatment of attention deficit disorder with hyperactivity. See PDR at 3131.

- 9 -

her pregnancy. (Tr. 254). Dr. Stahly prescribed Xyrem[12] and Lexapro. (Id.).

Plaintiff presented to Dr. Stahly on December 11, 2006, for a follow-up, at which time plaintiff reported that she could not afford the Xyrem. (Tr. 254). On December 13, 2006, Dr. Stahly provided plaintiff with information on an assistance program for Xyrem. (Id.).

On April 19, 2007, Dr. Stahly completed a Medical Source Statement-Mental, in which he expressed the opinion that plaintiff was extremely limited in her ability to maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; and travel in unfamiliar places or use public transportation. (Tr. 244-46). Dr. Stahly stated that plaintiff suffers from "severe-resistant narcolepsy, Cataplexy," which only poorly responds to medical treatment. (Tr. 246). Dr. Stahly stated that it was extremely dangerous for plaintiff to drive to and from work. (Id.).

On May 21, 2007, Dr. Hashmi completed a Medical Source Statement-Mental, in which he expressed the opinion that plaintiff was moderately limited in her ability to sustain an ordinary routine without special supervision. (Tr. 248). Dr. Hashmi found that plaintiff was markedly limited in her ability to carry out detailed instructions; maintain attention and concentration for extended periods; and travel in unfamiliar places or use public transportation. (Tr. 247, 249). Dr. Hashmi expressed the opinion that plaintiff was extremely limited in her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and complete a normal work-day or workweek without interruption from

---

[12]Xyrem is indicated for the treatment of excessive daytime sleepiness and cataplexy associated with narcolepsy. See PDR at 1132.

psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 247-48).

Dr. Hashmi also completed a Medical Source Statement-Physical, in which he expressed the opinion that plaintiff had no lifting limitations when she was awake, was able to stand or walk continuously for thirty minutes and was able to stand or walk for thirty minutes during the course of an eight-hour workday. (Tr. 250-51). Dr. Hashmi stated that plaintiff's ability to sit was limited by her tendency to go to sleep. (Tr. 251). He noted that plaintiff had no limitations in her ability to push or pull as long as she was awake. (Id.). Dr. Hashmi found that plaintiff would need to lie down to sleep approximately ten times a day for periods of thirty minutes to an hour each time. (Tr. 252). Dr. Hashmi noted that plaintiff had limitations with regard to driving or any task that would require attention due to her attacks of sleep. (Id.). Dr. Hashmi stated that plaintiff has been diagnosed with narcolepsy from a sleep study, which is characterized by ten to twelve episodes of sudden recurrent sleep periods and has affected plaintiff's ability to drive and be able to continue work without endangering herself or other staff members. (Tr. 253).

### **The ALJ's Determination**

The ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2010.

2. The claimant has not engaged in substantial gainful activity since July 24, 2006, the alleged onset date (20 CFR 404.1520(b) and 404.1571 et seq).

3. The claimant has the severe impairment of narcolepsy (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that

meets or medically equals any of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the full range of medium work, lifting or carrying 25 pounds frequently, less than 50 pounds occasionally and standing and walking approximately 6 hours of an 8 hour workday. She should avoid concentrated exposure to hazards (machinery, heights, etc.).

6. The claimant is capable of performing past relevant work as a certified nurse's assistant (20 CFR 404.1565). This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7. The claimant has not been under a disability, as defined in the Social Security Act, from July 24, 2006 through the date of this decision (20 CFR 404.1520(g)).

(Tr. 18, 23).

The ALJ's final decision reads as follows:

> Based on the application for a period of disability and disability insurance benefits filed on August 1, 2006, the claimant is not disabled under sections 216(I) and 223(d) of the Social Security Act.

(Tr. 24).

## Discussion
**A.     Standard of Review**

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency. See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996). The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it. See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion. See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998). If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's

findings, the denial of benefits must be upheld. See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision. See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996). "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary." Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998). The analysis required has been described as a "searching inquiry." Id.

### B. The Determination of Disability

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a). The claimant has the burden of proving that s/he has a disabling impairment. See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b). Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments. See 20 C.F.R §§ 404.1520 (c), 416.920 (c). To qualify as severe, the impairment must

significantly limit the claimant's mental or physical ability to do "basic work activities." Id. Age, education and work experience of a claimant are not considered in making the "severity" determination. See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). This listing is found in Appendix One to 20 C.F.R. 404. 20 C.F.R. pt. 404, subpt. P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work. See 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled. See id. If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. See id. Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

## C. Plaintiff's Claim

In her single claim, plaintiff argues that the ALJ erred in failing to assign the proper weight to the opinions of plaintiff's treating physicians Dr. Hashmi and Dr. Stahly. Specifically, plaintiff contends that the ALJ should have accorded controlling weight to the opinions of Drs. Hashmi and Stahly. Defendant argues that the ALJ properly rejected the opinions of Drs. Hashmi and Stahly.

"A treating physician's opinion is generally entitled to substantial weight; however, such an opinion is not conclusive in determining disability status, and the opinion must be supported by medically acceptable clinical or diagnostic data." Davis v. Shalala, 31 F.3d 753, 756 (8th Cir. 1994). Further, such opinions may also be discounted when a treating physician renders inconsistent opinions. See Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000). An ALJ is also free to reject the conclusions of any medical source if those findings are inconsistent with the record as a whole. See Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001). "The opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (quoting Kelley, 133 F.3d at 589).

Whatever weight the ALJ accords the treating physician's report, be it substantial or little, the ALJ is required to give good reasons for the particular weight given the report. See Holmstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001). However, an ALJ is not required to discuss every piece of evidence submitted. See Morrison v. Apfel, 146 F.3d 625, 628 (8th Cir. 1998). If the opinion of a treating physician is not well supported or is inconsistent with other evidence, the ALJ must consider: (1) the length of the treatment relationship and the frequency of

examination, (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed, (3) the degree to which the physician's opinion is supported by the relevant evidence, (4) consistency between the opinion and the record as a whole, (5) whether or not the physician is a specialist in the area upon which an opinion is rendered, and (6) other factors which may contradict or support the opinion. See 20 C.F.R. § 404.1527 (d)(2)-(6).

Dr. Hashmi completed a Medical Source Statement-Mental On May 21, 2007, in which he expressed the opinion that plaintiff was moderately limited in her ability to sustain an ordinary routine without special supervision; markedly limited in her ability to carry out detailed instructions, maintain attention and concentration for extended periods, and travel in unfamiliar places or use public transportation; and extremely limited in her ability to perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, complete a normal work-day or workweek without interruption from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 247-49). Dr. Hashmi also completed a Medical Source Statement-Physical, in which he expressed the opinion that plaintiff had no lifting limitations when she was awake, was able to stand or walk continuously for thirty minutes and was able to stand or walk for thirty minutes during the course of an eight-hour workday. (Tr. 250-51). Dr. Hashmi stated that plaintiff's ability to sit was limited by her tendency to go to sleep. (Tr. 251). He noted that plaintiff had no limitations in her ability to push or pull as long as she was awake. (Id.). Dr. Hashmi found that plaintiff would need to lie down to sleep approximately ten times a day for periods of thirty minutes to an hour each time. (Tr. 252). Dr. Hashmi noted that plaintiff had limitations with regard to driving or any

task that would require attention due to her attacks of sleep. (Id.).

The ALJ indicated that she was assigning "less weight" to the opinion of Dr. Hashmi as there is no indication that he had seen plaintiff since March 2005, more than two years from the time he provided his opinion. (Tr. 23). This finding is supported by the record. Dr. Hashmi last saw plaintiff on March 4, 2005, at which time he referred her to Dr. Stahly for sleep testing. (Tr. 218-19). Plaintiff underwent sleep testing on March 21, 2005, which was consistent with a diagnosis of narcolepsy. (Tr. 221). Plaintiff began seeing Dr. Stahly on April 13, 2005. (Tr. 222-23). There is no indication that plaintiff saw Dr. Hashmi again.

Dr. Stahly completed a Medical Source Statement-Mental on April 19, 2007, in which he expressed the opinion that plaintiff was extremely limited in her ability to maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; and travel in unfamiliar places or use public transportation. (Tr. 244-46). Dr. Stahly stated that plaintiff suffers from "severe-resistant narcolepsy, Cataplexy," which only poorly responds to medical treatment. (Tr. 246). Dr. Stahly stated that it was extremely dangerous for plaintiff to drive to and from work. (Id.).

The ALJ stated that she was assigning "less weight" to the opinion of Dr. Stahly because his opinion was inconsistent with the evidence. (Tr. 23). Specifically, the ALJ noted that plaintiff was able to continue to work until the birth of her child in April 2006 and that since that time, plaintiff has been able to care for three children, including a baby, on her own during the day. (Id.).

The undersigned finds that the ALJ provided sufficient reasons for assigning little weight

to the opinions of Drs. Hashmi and Stahly. As the ALJ noted, the doctors' opinions are inconsistent with plaintiff's reported daily activities. Plaintiff indicated in a Disability Function Report that she awoke around 5:00 a.m. to feed her baby, sent her two daughters to school at 8:15 a.m., performed housework, exercised for one half-hour to an hour daily, cooked dinner at night, shopped for groceries and clothing, and paid bills. (Tr. 119). At the hearing, plaintiff testified that she stayed at home during the day to care for her baby and two other children, who were aged eight and twelve, while her husband worked. (Tr. 266). Plaintiff also testified that she spent about an hour a day performing housework, including folding laundry, washing dishes, and sweeping the floor. (Tr. 268).

The ALJ also pointed out that plaintiff was able to work as a certified nurse's assistant without any special accommodation until July of 2006, despite being diagnosed with narcolepsy in March of 2005. (Tr. 262, 221). This is especially significant because plaintiff was able to work during the entire time she received treatment from Dr. Hashmi. This fact is highly inconsistent with Dr. Hasmi's opinion. Further, although Dr. Stahly last saw plaintiff in December 2006, he did not indicate that plaintiff's narcolepsy worsened since the time she quit working.

The ALJ also discussed the treatment notes of Drs. Hashmi and Stahly. The treatment notes do not support the extreme findings contained in their medical source statements. Plaintiff reported improvement at her January 4, 2005, and January 21, 2005 visits to Dr. Hashmi. (Tr. 212-15). Although plaintiff continued to report fatigue, she indicated that this occurred primarily in the evening when driving home from work. (Tr. 214). As mentioned above, plaintiff did not see Dr. Hashmi after March 2005.

Dr. Stahly's treatment notes also reveal improvement with treatment. On May 4, 2005,

Dr. Stahly noted that plaintiff had reported "marked improvement" in her cataplectic symptoms. (Tr. 224). He also indicated that an MRI of plaintiff's brain was normal. (Id.). At plaintiff's next visit, on August 2, 2005, Dr. Stahly indicated that plaintiff had done much better with the addition of Adderal, although she still experienced some problems with sleepiness at the wheel. (Tr. 193). Dr. Stahly noted that the Provigil plaintiff was taking was helping and that the Imipramine was controlling her tendencies for cataplexy. (Id.). Plaintiff's physical examination was unremarkable and plaintiff was intact neurologically. (Id.). Dr. Stahly indicated that he would assess plaintiff only every six months. (Id.).

The ALJ next discussed plaintiff's medications. The record reveals that plaintiff was able to work without medication until her baby was born. Plaintiff was also not taking medication at the time of the hearing. (Tr. 266). Plaintiff testified that she was not taking medication because she was unable to afford the medication. (Id.). Plaintiff also indicated that the last medication she took was ineffective. (Id.). First, as discussed above, Dr. Stahly's treatment notes refute plaintiff's claim that medication had been ineffective. Dr. Stahly's records also indicate that he provided plaintiff with information on a financial assistance program for her medication. (Tr. 254). There is no indication that plaintiff sought this assistance. As such, the fact that plaintiff was not taking medication for her narcolepsy is inconsistent with the extreme limitations found by Drs. Hashmi and Stahly.

In sum, the record reveals that the ALJ considered the opinions of Drs. Hashmi and Stahly and decided to assign little weight to them. The ALJ provided sufficient reasons for this decision. The ALJ found that the opinions of Drs. Hashmi and Stahly were inconsistent with the evidence of record. Substantial evidence supports this determination. Specifically, the fact that plaintiff

was able to work without medication for over a year after being diagnosed with narcolepsy, the treatment notes of Drs. Hashmi and Stahly reflecting improvement, plaintiff's ability to care for her children on her own every day, and plaintiff's failure to take medication at the time of the hearing are inconsistent with the opinions of Drs. Hashmi and Stahly that plaintiff suffers from disabling narcolepsy.

## **Conclusion**

Substantial evidence in the record as a whole supports the decision of the ALJ finding plaintiff not disabled because the evidence of record does not support the presence of a disabling impairment. Accordingly, Judgment will be entered separately in favor of defendant in accordance with this memorandum.

Dated this  18th  day of March, 2009.

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE